UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PINKY SPARKS

VERSUS

NATIONAL VISION, INC.
d/b/a AMERICA'S BEST
CONTACTS AND EYEGLASSES

CIVIL ACTION

NO. 10-2372

MAGISTRATE JUDGE
JOSEPH C. WILKINSON, JR.

## <u>ORDER AND REASONS ON MOTION</u>

This is an employment discrimination case brought by plaintiff, Pinky Sparks,

against her former employer, National Vision, Inc. d/b/a America's Best Contacts and

Eyeglasses ("National Vision"). Sparks originally alleged in her complaint that she was

subjected to racial and sexual discrimination and harassment and to retaliation in her

employment. However, plaintiff has now waived all of her claims, except retaliation.

Plaintiff's memorandum in opposition to defendant's motion for summary judgment,

Record Doc. No. 34 at p. 2.

This matter was referred to a United States Magistrate Judge for all proceedings

and entry of judgment in accordance with 28 U.S.C. § 636(c) upon written consent of all

parties. Record Doc. No. 9.

National Vision filed a motion for summary judgment, supported by excerpts from

deposition transcripts, documentary exhibits and declarations under penalty of perjury.

Record Doc. No. 27. Defendant argues that Sparks cannot establish a prima facie case

of retaliation. National Vision also contends that, even if Sparks could make out a prima

facie case of retaliation, she has no evidence of any causal connection between her allegedly protected conduct and her termination, and no evidence to rebut defendant's proffered legitimate, nonretaliatory reasons for terminating her. Plaintiff filed a timely opposition memorandum, supported by excerpts from deposition transcripts, documentary exhibits and declarations under penalty of perjury. Record Doc. No. 34. She argues that she has sufficient evidence to create genuine issues of disputed material fact as to her sole remaining claim of retaliation. National Vision received leave to file a reply memorandum, Record Doc. Nos. 35, 36, 37.

Having considered the complaint, the record, the submissions of the parties and the applicable law, and for the following reasons, IT IS ORDERED that defendant's motion for summary judgment is GRANTED.

## I.    FACTUAL BACKGROUND

Except where I have noted certain disputes that I have either resolved for present purposes in plaintiff's favor or that are immaterial, the following material facts are accepted as undisputed, solely for purposes of the pending motion for summary judgment.

National Vision is a national retail optical chain. Sparks began working at defendant's store in Slidell, Louisiana in 2006 as a part-time dispensing optician. She was later promoted to Assistant Manager–Contact Lenses and then Assistant Manager–Eyeglasses. As an assistant manager, she reported to the store's on-site

General Manager. The General Manager reported to the District Manager, Tina Wicker, a Caucasian, and the Area Manager, Andre Campbell, an African-American.

The General Manager in Slidell when Sparks began working as assistant manager was Mike Nguyen, an Asian-American. Angela Miller, an African-American, became the General Manager in September 2007. In February 2008, Miller was transferred to National Vision's new store in Mandeville, Louisiana. Ben Ramsey, a Caucasian, replaced her at the Slidell store as the General Manager on February 25, 2008. Effective May 8, 2008, Ramsey was transferred to the Mandeville store and Miller was transferred back to the Slidell store as General Manager.

When a National Vision employee violates company policy or performs poorly, the employee receives either an Employee Performance Statement, an Action Plan or a Performance Improvement Plan. Each document is prepared by the General Manager, reviewed by the District Manager and approved (or revised) by Human Resources. National Vision has a progressive discipline system, under which an employee who violates company policy or has performance problems is generally given a series of progressively more serious disciplinary notices. The steps in the progressive discipline system are a written Verbal Warning, Formal Written Warning, Final Written Warning and termination. As assistant manager, Sparks received numerous disciplinary write-ups, all of which were reviewed and approved by Keshia Moore, an African-American Employee Relations Specialist with National Vision, before they were issued.

If an employee who has received a Final Written Warning commits another policy infraction or does not improve her performance, her employment may be terminated. Both the District Manager and Human Resources must approve any termination decision.

Nguyen issued a written Action Plan to Sparks on June 4, 2007, detailing several areas in which her performance needed to improve and giving her a one-week deadline to accomplish the improvements. However, this Action Plan was <u>not</u> denominated as a written warning under the progressive discipline policy. Defendant's Exh. 4 attached to declaration under penalty of perjury of Keshia Moore, Defendant's Exh. C.

Miller took over as plaintiff's General Manager three months later. Miller's general practice is to issue written performance documentation only after she has tried to improve a poorly performing employee's problem with repeated verbal coaching. Defendant's Exh. D, deposition transcript of Angela Miller, at p. 35. On September 15, 2007, Miller gave Sparks a written Verbal Warning, the first step in the progressive discipline policy, after Sparks allowed an employee under her supervision to accrue overtime in violation of company policy to monitor and minimize overtime. Defendant's Exh. 5 attached to Moore's declaration.

Plaintiff received a Performance Improvement Plan/Formal Written Warning, the second step in the progressive discipline system, from Miller on September 24, 2007. Sparks was given 30 days to improve her job performance in 13 specific areas. Defendant's Exh. 6 attached to Moore's declaration.

Miller issued another Performance Improvement Plan/Formal Written Warning to plaintiff on November 5, 2007. This second Formal Written Warning listed numerous deficiencies in plaintiff's job performance, including insubordination, incompetence and negligence in her job skills. Defendant's Exh. 7 attached to Moore's declaration. Miller gave Sparks another 30 days to improve in the specific areas listed. Sparks refused to sign this performance documentation.

On Ramsey's first day as General Manager in the Slidell store in February 2008, he introduced himself to the employees by saying that he was a "redneck" and the new sheriff in town. He also described himself as a "redneck" to other employees on several occasions. Sparks was uncomfortable with the word "redneck" and felt that it was racially offensive.

According to Monica McKevitt, a Caucasian employee under Sparks's supervision, Ramsey asked McKevitt on or about March 17, 2008 to be his "eyes and ears" at the Slidell store and made several derogatory comments to her about black people. Ramsey also reportedly told McKevitt that Sparks had been working at the store too long. McKevitt telephoned Sparks at home that night and told her what Ramsey had said. Plaintiff's Exh. E, affidavit of Monica McKevitt, ¶¶ 10 through 13.

Sparks called District Manager Wicker from the store the next morning and told her that McKevitt needed to talk to her about Ramsey. Sparks did not tell Wicker what

McKevitt told her Ramsey had said. Sparks handed the telephone to McKevitt and left the room.

McKevitt states in her affidavit that she told Wicker specifically what Ramsey had said about black people and that he had called himself a redneck. Wicker told McKevitt to write down her detailed allegations and send the written statement to Wicker. McKevitt avers that she wrote a statement and faxed it to Wicker the same day. Plaintiff's Exh. E, McKevitt affidavit, ¶ 16.

Wicker admits that McKevitt called her on or about March 19, 2008 and said generally that there was a state of unrest in the store, the atmosphere was uncomfortable and Ramsey had said some inappropriate, but unspecified, things. Wicker also admits that she asked McKevitt to write down the details of the incidents about which McKevitt complained and send the statement to Wicker, so that it could be investigated. Wicker denies ever receiving a written statement from McKevitt. No such written statement appears in the exhibits submitted by either party. Wicker nonetheless sent a memo to all stores in her district reminding the managers of National Vision's anti-harassment policy.

Sparks never reported to Wicker what McKevitt had told plaintiff. Contrary to National Vision's policy, neither Sparks nor Wicker reported McKevitt's complaint to Human Resources.

On April 9, 2008, Ramsey, Wicker and Area Manager Campbell met with Sparks at the Slidell store to discuss her job performance. According to Sparks, Wicker said that

plaintiff should not have allowed McKevitt to "make these remarks about" Ramsey and that, as his assistant manager, she should protect Ramsey, but that Ramsey could not trust her to "have his back." Ramsey told her that she was untrustworthy and a liar. Plaintiff's Exh. A, deposition of Pinky Sparks at pp. 44-48. Plaintiff was told to sign a disciplinary write-up and to send Wicker a letter with a plan, explaining why National Vision should keep her as an employee.

Wicker denies ever telling Sparks, in any of several meetings regarding plaintiff's job performance, that she should "have [Ramsey's] back." Defendant's Exh. B, Wicker declaration, ¶13.

Instead of writing a letter explaining why National Vision should keep her, Sparks the next day "wrote a letter [to Wicker] telling them how I felt" about what had happened. Plaintiff's Exh. A, Sparks deposition at p. 54. Plaintiff's letter referred to the meeting of the previous day and Wicker's comment at that meeting that Sparks "was not ready to be a manager because I referral [sic] a [sic] employee to you directly instead of attempting to handle the situation myself." Sparks explained in the letter that "the intent of me sending her [presumably McKevitt] to you is because of the sensitive nature of racially charge[d] remarks inappropriate comment made about Ben Ramsey." Sparks also referred to Wicker's comment at the meeting that "the employees were scarred [sic] or intimidated by me." Plaintiff said she did not "understand why you were requesting of me a two week notice. Were you asking me to resign? If my job performance was

poor I could understand but there seems to be a personality difference and idiosyncratic [sic]. I feel you have unfairly labeled me as a [sic] employee that is difficult to get along with . . . ." Plaintiff's Exh. F.

Although the letter is addressed to Wicker, Sparks handed the letter to Ramsey the next day. According to Sparks, Ramsey talked to Wicker on the telephone, then told her to go home for three days because it was not the letter they wanted and that she should write another letter. Sparks never wrote a second letter to Ramsey or Wicker.

Ramsey wrote a letter to Human Resources dated April 10, which was received on April 11, 2008. In this letter, he said that he brought Sparks into his office on April 10th to give her an action plan, explained the specific items that needed improvement and the steps she should take to achieve them and asked her to sign, which she declined to do. He said that he told her that the "defense letter" she had given him the day before demonstrated her "disregard for proper protocol and the inability to take directives from general and district managers." He told her that he needed a statement of commitment from her by the close of business the next day. She refused to converse with him or with Campbell, who was participating by speaker phone. She left the office and "became very defiant and disruptive to the optical department so I asked her to go home." He concluded that, based on the documentation in her file, Sparks "has had an ongoing problem with rank and file, following directives from general managers and following the chain of command in addition to falling short in her job duties. I feel that at this point

she will be a serious detriment to the well being and growth of the staff at this location." Plaintiff's Exh. G.

On April 10, 2008, Ramsey gave Sparks a written Action Plan/Final Written Warning, the third step in National Vision's progressive discipline policy. The Action Plan/Final Written Warning stated that she had a deadline of 30 days to improve or she would be terminated. Defendant's Exh. 8 attached to Moore's declaration.

Sparks called Employee Relations Specialist Moore the next day and complained that Ramsey was discriminating against her and harassing her on the basis of race and that Ramsey and Wicker were retaliating against her. Plaintiff complained specifically about Ramsey's "redneck" comments and that Ramsey and Wicker had disciplined her the day before. Moore learned for the first time during that conversation that McKevitt had previously complained about Ramsey calling himself a redneck. Plaintiff followed up their phone conversation with a letter to Moore dated April 14, 2008, which did not include any allegations of racial harassment. She complained that she had been told not to say anything during the meeting on April 9th and to write down any questions that she had so that she could ask them at the end. She said that she had felt threatened by the "attack" of her three supervisors and that she still did not know what was going on. Plaintiff's Exh. J.

Moore investigated Sparks's and McKevitt's complaints by interviewing both of them, as well as Ramsey, Wicker and other Slidell store employees. Moore discovered

that Ramsey had been keeping plaintiff's personnel file in his car because Wicker told him to do so. Wicker explained to Moore that she did not want Sparks to remove any information from her personnel file. Although the April 10th Action Plan/Final Written Warning gave plaintiff 30 days to improve her performance, Ramsey told Moore that he changed plaintiff's shift on April 14, 2008 because he was waiting for permission from Human Resources to terminate her.

When Sparks reported back to work after having been sent home for three days, her code for the store's alarm system had been changed or dropped. She complained to Ramsey, who told her to use his code. She was given her own code later the same day. Plaintiff's Exh. A, Sparks deposition at pp. 64-67.

Moore's investigation failed to substantiate all of the allegations against Ramsey, but she concluded that he had referred to himself several times as a "redneck." With the approval of the Human Resources Director, Moore decided to transfer Ramsey to another store to separate him from McKevitt and Sparks. Wicker gave Ramsey a Performance Improvement Plan/Formal Written Warning dated May 9 and signed on May 12, 2008, which stated that he had violated National Vision's harassment and grounds for dismissal policies by making offensive and unprofessional comments in the workplace, and that any further unprofessional comments would lead to further disciplinary action, up to and including termination. Defendant's Exh. 3 attached to Moore's declaration. Ramsey began working at the Mandeville store as General Manager on May 8, 2008.

On May 6, 2008, before he was transferred out of the Slidell store, Ramsey called Sparks and another employee named Amanda into his office. He accused Sparks of having forced Joy Carpenter, a new optician, to quit. Sparks testified that Ramsey was red-faced "behind a desk and he went to raving, going off . . . . And he was raving on and on" about how plaintiff made Carpenter quit and "was hollering to the top of his lungs." Sparks said she backed up and stepped behind Amanda "because it was like he was coming over the desk to me and I got behind Amanda and he ran out of the room and went into the bathroom." Plaintiff's Exh. A, Sparks deposition at pp. 70-71, 74. Sparks left the store and went to her car, where she called Wicker to complain about Ramsey's conduct. Wicker was not sympathetic, told plaintiff that there was nothing wrong with Ramsey because Wicker had just spoken to him, and hung up the phone. Id. at p. 73. Plaintiff then called Jamie Williams in Human Resources and asked whether she should go home or call the police. Williams said she could not give plaintiff permission to go home, but would call someone else and then call Sparks back. While plaintiff was waiting for someone to call her back, she saw Ramsey leave the store, so she went back into the store. No one from the corporate office called her back. Id. at pp. 74, 149-50.

At the expiration of the 30-day period of the April 10, 2008 Action Plan that had been issued to Sparks, Ramsey wrote a three-page letter entitled "Results of 30 day Action Plan administered to Pinky Sparks 4/10/08," in which he detailed specific dates and incidents of plaintiff's continued poor job performance in several areas in which she

had been told she must improve, through May 6, 2008 (his last day in the Slidell store). One of the problems he mentioned was that Joy Carpenter had quit because, as she had told him, she was so upset at being treated rudely and unprofessionally by Sparks, who had created a "hostile work environment . . . [,] made it too uncomfortable for her and was arguing with her at every opportunity rather than training her." Ramsey concluded that Sparks still "falls short of her job duties, continues to have a problem with rank and file, does not follow directives and certainly is not a team player when she is doing things like passing off problem patients to associates and when she is treating new associates so rudely that they quit." He recommended that plaintiff's employment be terminated. Defendant's Exh. 11 attached to Moore's declaration.

Sparks filed a formal charge of race discrimination and retaliation with the Equal Employment Opportunity Commission on May 7, 2008, alleging incidents of racial harassment, discrimination and retaliation by Ramsey and Wicker between March 10 and May 7, 2008. Plaintiff complained that Wicker had retaliated against her for having told McKevitt to report Ramsey's racially offensive statements to Wicker and for "repeatedly reporting Ramsey to the Human Resources Department because Ms. Wicker failed to take the necessary disciplinary actions against Mr. Ramsey." Plaintiff's Exh. X. The same day, McKevitt filed a formal charge with the EEOC of racial and sexual discrimination and harassment by Ramsey, alleging continuing action between March 10

and May 7, 2008. She stated that she had complained about the harassment to Moore in Human Resources, but that no action had been taken to correct it. Plaintiff's Exh. Y.

Miller was transferred back to the Slidell store on May 8, 2008. During the two months that she was in Mandeville, she was not aware of what was going on in the Slidell store. She was not happy about leaving the Mandeville store. No one told her why Ramsey had been transferred out of Slidell, that she needed to discipline Sparks when she returned or that Sparks or McKevitt had complained about Ramsey while he was General Manager. Miller did not know about McKevitt's complaints about Ramsey until the store received a letter from the EEOC with McKevitt's charge of discrimination. Miller sent the letter to Wicker or Human Resources after she opened it. Plaintiff's Exh. B, Miller deposition at pp. 29-34, 39; Defendant's Exh. B, declaration under penalty of perjury of Tina Wicker, ¶ 10. Although Sparks speculates that Miller must have received her own EEOC charge because it was filed the same day as McKevitt's, the evidence is uncontradicted that Miller never saw plaintiff's charge. Plaintiff's Exh. B, Miller deposition at p. 121.

Sparks testified that, around the time that Miller returned to the store in early May, she was told by some subordinate employees that Miller had told them not to listen to what Sparks told them to do and only to do what Miller told them. When Sparks questioned Miller about this, Miller responded only that she was the general manager and that employees should do what she said. Plaintiff's Exh. A, Sparks deposition at pp. 101-

03.  Miller denied that she ever told the employees not to listen to what Sparks told them to do.  Plaintiff's Exh. B, Miller deposition at pp. 71-72, 114-15.

On May 10, 2008, Miller gave Sparks a written Verbal Warning for failing to monitor employee payroll, in violation of company policy, because an employee under plaintiff's supervision had accrued overtime during the two previous days.  Miller warned Sparks that such a violation could lead to termination.  Instead of taking supervisory responsibility, plaintiff blamed the employee and refused to sign the disciplinary notice.  Defendant's Exh. 9 attached to Moore's declaration.  Miller also disciplined the employee who had accrued the overtime and the Assistant Manager of Contact Lenses for a similar overtime violation by one of her employees.

Upon her return to the Slidell store, Miller performed a "self-audit" of the store to check whether tasks were being handled timely and in compliance with company policy.  Plaintiff's Exh. B, Miller deposition at p. 41.  On May 12, 2008, she wrote a report describing 14 problem areas in the eyeglass department that her audit had identified.  She concluded that "[a]s the previous General Manager of store 5222, these are issues [that] I, Angela Miller had with Pinky Sparks, the optical manager[,] before leaving several weeks ago."  Defendant's Exh. 12 attached to Moore's declaration; Plaintiff's Exh. N.

Wicker then sent Ramsey's three-page letter and Moore's self-audit report to Moore in Human Resources.  Wicker told Moore that plaintiff's "thirty day action plan

is up. The issues are still present in the store. Here are the statements from both managers. I need to get approval for the termination." Plaintiff's Exh. O. Wicker's termination request apparently was not approved, as Sparks continued to work.

On June 23, 2008, Miller wrote to Human Resources, describing the continuing difficulties that she was having with plaintiff's job performance. Miller reported that, even though she had met with Sparks three times in May, Sparks had not initiated anything that Miller had instructed her to do. Miller listed 18 performance problem areas, including plaintiff's failure to take directives from Miller ("this is a huge problem"), changing the low ratings on an employee evaluation to higher ones rather than revising the evaluation to explain the low ratings, insubordination, failure to "respond to training and correction," "not a team player," "does not manage" and refusal "to sign all coaching counseling and all write up[s]." Miller concluded: "These issues have been going on for some time and have not changed in the last year, let alone 30 days. I am very concerned about the insubordination and taking directives. These are very serious issues and has [sic] great effect on store morale." Defendant's Exh. 13 attached to Moore's declaration.

Miller wrote to Human Resources on July 16, 2008, stating that, based on her year of experience in managing Sparks, plaintiff "has good selling skills, but has great need of improvement on management skills. Pinky is insubordinate, and doesn't have respect for authority figures. I have had several meetings with Pinky on store issues, areas of

improvements, areas that are doing well, etc." Miller gave several specific, dated examples of plaintiff's continuing performance problems. Miller concluded:

> These are only a few of many noncompliant issues that [I] have with Mrs. Sparks. No matter how much I document or how many meeting [sic] I have, it seems as though it's always the same situations. I have nothing against Pinky, but the fact of the matter is that a general manager cannot be productive and maintain a happy loyal staff when your assistant manager is undermining, insubordinate, not a team player and wants things her way.

Defendant's Exh. 14 attached to Moore's declaration.

On July 21, 2008, Miller gave Sparks another Action Plan/Final Warning that included 15 specific areas in which plaintiff must improve within 30 days or risk being discharged. Defendant's Exh. 10 attached to Moore's declaration. Miller communicated this Action Plan line by line to plaintiff in the presence of District Manager Wicker and Area Manager Campbell. According to Wicker, Sparks was argumentative and defiant throughout the meeting and complained about Miller. Defendant's Exh. B, Wicker declaration, ¶ 14. Sparks refused to sign the Action Plan because, she said, she had not been allowed to talk. Plaintiff was permitted to ask questions about the Action Plan and she understood what she had to do to achieve its goals. She added a comment at the bottom of the Action Plan that she had listened to the reasons for the Action Plan. Defendant's Exh. B, Wicker declaration, ¶ 14; Plaintiff's Exh. A, Sparks deposition at pp. 97, 106.

Sparks testified that she could not accomplish one of the goals of the Action Plan, to maintain the staff development files properly, because Miller had the files locked in her desk.  Plaintiff's Exh. A, Sparks deposition at pp. 97-100, 107.  Miller admitted that she kept the staff files locked, but testified that all plaintiff had to do was ask her to unlock them if she needed the files.  Plaintiff's Exh. B, Miller deposition at p. 115.

Sparks testified that, one or two weeks after she was given the 30-day Action Plan, she asked Miller if she could see where Miller was writing in plaintiff's personnel file the tasks that Sparks thought she had completed in that time.  Miller told Sparks that she could not see her personnel file because it was at Miller's house, where it had been since Miller retrieved it from Ramsey.  Plaintiff complained about this to Wicker's superior manager, but she did not hear back from Wicker's superior and never saw her file before she was fired two weeks later.  Plaintiff's Exh. A, Sparks deposition at pp. 107-09.

At the expiration of the latest 30-day Action Plan/Final Warning, Miller reported to Human Resources on August 22, 2008 that Sparks "failed to meet the requirements set forth in the action plan."  Going through the Action Plan item by item, Miller acknowledged that Sparks had accomplished a few tasks, but the vast majority of the items were uncompleted.  She concluded that Sparks "failed to meet the expectations that were set forth for her on several action plans[,] including this one."  Defendant's Exh. 15 attached to Moore's declaration.

In assessing plaintiff's overall poor performance as a manager, Wicker testified that Sparks never met her sales goals and expectations and never did a good job as a manager "the entire time" that she was the Eyeglass Assistant Manager. Wicker stated that Sparks "can do what <u>she</u> needs to do, but she can't get the staff to do what they need to do; and she couldn't get the associates to move in the direction we needed them to move in." Plaintiff's Exh. D, Wicker deposition at pp. 65-66 (emphasis added).

Because Sparks was on a Final Warning and her performance had not improved by August 22, 2008, District Manager Wicker requested permission from Human Resources to terminate her employment. After reviewing all of the performance documentation in plaintiff's file, Moore approved the termination. Wicker told Sparks that she was terminated that day.

II.     DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

A.     Standards of Review

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 was revised to "take effect on December 1, 2010, and shall govern in all proceedings thereafter commenced and, insofar as just and practicable, all proceedings then pending." Order of the Supreme Court of the United States (Apr. 28, 2010),

www.supremecourt.gov/orders/courtorders/frcv10.pdf. Because "the standard for granting summary judgment remains unchanged" by the revision, <u>Federal Civil Judicial Procedure and Rules</u>, 2010 Amendments Advisory Committee Notes, at 260 (West 2011 rev. ed. pamph.) (hereafter "Advisory Committee Notes"), I find it just and practicable to apply the revised Rule 56 in this proceeding.

Revised Rule 56 establishes new procedures for supporting factual positions:

(1) A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
(3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.
(4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Thus, the moving party bears the initial burden of identifying those materials in the record that it believes demonstrate the absence of a genuinely disputed material fact, but it is not required to negate elements of the nonmoving party's case. <u>Capitol Indem.</u>

Corp. v. United States, 452 F.3d 428, 430 (5th Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "[A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to [a particular material] fact." Advisory Committee Notes, at 261.

A fact is "material" if its resolution in favor of one party might affect the outcome of the action under governing law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). No genuine dispute of material fact exists if a rational trier of fact could not find for the nonmoving party based on the evidence presented. Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd., 40 F.3d 698, 712 (5th Cir. 1994).

To withstand a properly supported motion, the nonmoving party who bears the burden of proof at trial must cite to particular evidence in the record to support the essential elements of its claim. Id. (citing Celotex, 477 U.S. at 321-23). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." Celotex, 477 U.S. at 323; accord Capitol Indem. Corp., 452 F.3d at 430.

"Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists." Edwards v. Your Credit, Inc., 148 F.3d 427, 432 (5th Cir. 1998); accord Murray v. Earle, 405 F.3d 278, 284 (5th Cir. 2005). "We do not, however, in the absence of any

proof, assume that the nonmoving party could or would prove the necessary facts." Badon v. R J R Nabisco Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quotation omitted) (emphasis in original). "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to support the complaint."'" Nat'l Ass'n of Gov't Employees, 40 F.3d at 713 (quoting Anderson, 477 U.S. at 249).

"Moreover, the nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (quotation omitted) (emphasis in original); accord Duron v. Albertson's LLC, 560 F.3d 288, 291 (5th Cir. 2009).

B.      Plaintiff Cannot Rebut Defendant's Legitimate Non-Retaliatory Reasons

Defendant raises several arguments in its motion for summary judgment, some of which have been mooted by plaintiff's abandonment of her sexual and racial discrimination and harassment claims. Plaintiff's only remaining claim is for retaliation.

Sparks has no direct evidence of retaliation. Thus, she bears the initial burden of proving a prima facie case of retaliation. Ogletree v. Glen Rose Indep. Sch. Dist., 443 F. App'x 913, 917-18 (5th Cir. 2011). To establish a prima facie case, she "must show

(1) that [s]he engaged in a protected activity; (2) that an adverse employment action occurred; and (3) that a causal link existed between the protected activity and the adverse action." Drake v. Nicholson, 324 F. App'x 328, 331 (5th Cir. 2009) (citing Holloway v. Dep't of Veterans Affairs, 309 F. App'x 816, 818 (5th Cir. 2009); LeMaire v. La., 480 F.3d 383, 388 (5th Cir. 2007)); accord Ogletree, 443 F. App'x at 917.

> If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action. The employer's burden is only one of production, not persuasion, and involves no credibility assessment. If the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory or retaliatory purpose. To carry this burden, the plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer.

McCoy v. City of Shreveport, 492 F.3d 551, 557 (5th Cir. 2007) (citations omitted).

Defendant argues that Sparks did not engage in activity protected by Title VII until April 11, 2008, when plaintiff called Moore to complain of race discrimination and retaliation. Plaintiff responds that her participation in putting McKevitt in touch with Wicker on or about March 19, 2008, so that McKevitt could complain to Wicker about Ramsey's racially offensive comments, was protected activity. See 42 U.S.C. § 2000e-3(a) (making it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing under this subchapter.") (emphasis added).

According to Wicker, McKevitt was not specific enough during their telephone conversation to constitute a complaint of discrimination, and Wicker disputes McKevitt's affidavit that McKevitt sent her a detailed written statement. However, Wicker admits that she responded to their telephone conversation by sending "a memo reminding management personnel of National Vision's anti-harassment policy" to all stores in her district. Defendant's Exh. B, ¶ 6. Resolving these factual disputes in favor of plaintiff's version of the events, I find that Sparks participated in protected activity as early as March 18 or 19, 2008. She thus satisfies the first prong of her prima facie case as of that date.

National Vision concedes that plaintiff's termination was an adverse action, but argues that the actions of its managers after March 19, 2008 and before plaintiff was fired did not rise to the level of adverse employment actions sufficient to meet the second prong. As to the third prong, National Vision argues that Sparks cannot establish a causal link between any protected activity and any adverse employment action.

I find it unnecessary to address whether plaintiff can meet the second or third prong of a prima facie case of retaliation. Even assuming without deciding that Sparks could establish a prima facie case, National Vision has met its burden of production by proffering legitimate non-retaliatory reasons for all of its disciplinary actions, up to and

including termination.  Sparks received numerous disciplinary notices before, during and after Ramsey's tenure as her General Manager, which documented continuous, repetitive performance problems.  She failed to improve her job performance despite being given multiple chances to do so.  Indeed, National Vision gave Sparks more opportunities to improve than its own progressive discipline policy required, as it gave her <u>two</u> Formal Written Warnings (the second step in the policy) in September and November 2007, and <u>two</u> Final Written Warnings (the third step) on April 10 and July 21, 2008, all focused on many of the same problem areas.  Contrary to Sparks's arguments, Miller did <u>not</u> testify that the passage of time after the September and November 2007 and April 2008 write-ups without the next higher disciplinary step having been taken meant that plaintiff's identified problems had completely resolved during that time.  Plaintiff's Exh. B, Miller deposition at pp. 38, 88.  Plaintiff's well-documented, ongoing poor performance was a legitimate, non-retaliatory reason for National Vision to discipline and to fire her.

"Thus, the burden returns to the plaintiff to prove that the protected conduct was a 'but for' cause of the adverse employment decision."  <u>Ogletree</u>, 443 F. App'x at 917 (quotation omitted).  Sparks has failed to come forward with evidence to establish a triable genuine issue of fact as to whether defendant's proffered reasons were false or pretextual or that retaliation was the "but for" cause of the disciplinary actions taken against her.

Plaintiff's argument that a factfinder can infer "but for" causation from the mere temporal proximity of the disciplinary actions to her participation in activity protected by Title VII is unavailing. "'But for' causation . . . <u>cannot</u> be established by temporal proximity alone." <u>Hernandez v. Yellow Transp., Inc.</u>, No. 09-10183, 2012 WL 400569, at *13 (5th Cir. Feb. 9, 2012) (citing <u>Strong v. Univ. Health Care Sys., L.L.C.</u>, 482 F.3d 802, 807 (5th Cir. 2007)) (emphasis added); <u>accord</u> <u>Roberson v. Alltel Info. Servs.</u>, 373 F.3d 647, 656 (5th Cir. 2004).

Sparks alleges that Miller and Wicker retaliated against her because she and McKevitt had complained of Ramsey's racially insensitive comments. However, when Miller returned to the Slidell store in May 2008, she did not know about Ramsey's comments or the complaints of the two women. It is axiomatic that a supervisor cannot retaliate for protected activity if she does not know of it. <u>Balakrishnan v. Bd. of Supervisors</u>, No. 10-31209, 2011 WL 6003312, at *4 (5th Cir. Nov. 29, 2011); <u>Roberts v. Unitrin Specialty Lines Ins. Co.</u>, 405 F. App'x 874, 879 (5th Cir. 2010) (citing <u>Manning v. Chevron Chem. Co.</u>, 332 F.3d 874, 884 (5th Cir. 2003)).

Upon her return, Miller conducted a self-audit that identified 14 problem areas in the eyeglass department. She reported that "these are issues [that] I, Angela Miller had with Pinky Sparks, the optical manager[,] before leaving several weeks ago." Wicker used Miller's May 12, 2008 audit report, along with Ramsey's three-page letter entitled "Results of 30 day Action Plan administered to Pinky Sparks 4/10/08," to request

permission from Human Resources to terminate plaintiff. However, no termination decision was made until August 22, 2008, four months after Sparks had been given a Final Written Warning in April, three months after Miller's audit report had revealed the same issues with plaintiff's job performance as when Miller had supervised her before leaving the Slidell store in February 2008, and one month after the second Final Written Warning in July 2008. Despite all of these written warnings and oral counseling, Sparks failed to improve her conduct month after month.

Each of the disciplinary notices and the termination decision were approved by the store's General Manager at the time (either Miller or Ramsey), by District Manager Wicker and by Moore in Human Resources. Miller and Moore are both African-American. Miller testified that she would be offended if a white supervisor used the term "redneck" at work because she considered it a racist term. When Moore learned on April 11, 2008 of the complaints of Sparks and McKevitt about Ramsey's comments, Moore investigated, found that the "redneck" comments were substantiated, and decided within less than a month to transfer Ramsey. Based on Moore's investigation, Wicker gave Ramsey a Performance Improvement Plan/Formal Written Warning dated May 9, 2008, which was also approved by Moore. Area Manager Campbell, another African-American, participated in at least two of the meetings held with Sparks about her inadequate job performance. Even resolving any fact dispute with Wicker in favor of plaintiff's testimony regarding the events of the April 9, 2008 meeting, no reasonable

factfinder could infer under these circumstances that Wicker and Miller retaliated against Sparks for having reported that Ramsey had made racist comments.

Sparks asserts that the various disciplinary notices she received were unfair or false because she was a good employee, but she has produced no <u>evidence</u> other than her own conclusory and self-serving statement to support her allegation. <u>See</u> <u>Irons v. Aircraft Service Int'l, Inc.</u>, 392 F. App'x 305, 313-14 (5th Cir. 2010) (when plaintiff failed to adduce any evidence to support an inference that defendant's proffered justification was pretextual, summary judgment was properly granted as to plaintiff's retaliation claim). "[A]nti-discrimination laws are not vehicles for judicial second-guessing of business decisions." <u>Mato v. Baldauf</u>, 267 F.3d 444, 452 (5th Cir. 2001) (quoting <u>Deines v. Tex. Dep't of Protective & Regulatory Servs.</u>, 164 F.3d 277, 281 (5th Cir. 1999)). "Whether an employer's decision was the correct one, or the fair one, or the best one is not a question within the jury's province to decide. The single issue for the trier of fact is whether the employer's [action] was motivated by discrimination" or retaliation. <u>Bell</u>, 171 F. App'x at 445 (quotation omitted); <u>accord</u> <u>Cervantez v. KMGP Servs. Co.</u>, 349 F. App'x 4, 10 (5th Cir. 2009) (citing <u>Waggoner v. City of Garland</u>, 987 F.2d 1160, 21 1165 (5th Cir. 1993)). It is immaterial whether defendant's decision to terminate plaintiff may have been based on incorrect facts, so long as its decision was not motivated by retaliatory animus. <u>Scales v. Slater</u>, 181 F.3d 703, 711 (5th Cir. 1999).

Sparks has produced only speculation and "bald conclusory assertion[s]" to rebut defendant's non-retaliatory reasons for its disciplinary actions.  Chambers v. Sears Roebuck & Co., 428 F. App'x 400, 419 n.54 (5th Cir. 2011).  Such assertions are insufficient to create a genuine issue of disputed fact. Id.; see Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l, 343 F.3d 401, 405 (5th Cir. 2003) (to defeat a motion for summary judgment, the nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case"); In re Hinsley, 201 F.3d 638, 643 (5th Cir. 2000) (self-serving and unsupported statements will not defeat summary judgment when the evidence in the record is to the contrary).

Accordingly, National Vision is entitled to summary judgment in its favor as a matter of law.

<u>CONCLUSION</u>

For all of the foregoing reasons, **IT IS ORDERED** that defendant's motion for summary judgment is GRANTED and that plaintiff's claims are DISMISSED WITH PREJUDICE.

Judgment will be entered accordingly, plaintiff to bear all costs of this proceeding.

Fed. R. Civ. P. 54(d)(1).

New Orleans, Louisiana, this ____23rd____ day of February, 2012.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE